No. 2-09-1287     Filed: 11-17-10

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | |
|---|---|
| FIRST BANK, | ) Appeal from the Circuit Court of Lake |
| | ) County. |
| Plaintiff-Appellee, | ) |
| | ) |
| v. | ) No. 08--L--1066 |
| | ) |
| UNIQUE MARBLE AND GRANITE | ) |
| CORPORATION and DANIEL M. HAHN, | ) |
| | ) |
| Defendants | ) |
| | ) |
| (James Gallo, as Assignee for the Benefit | ) Honorable |
| of Creditors of Unique Marble and Granite | ) Michael J. Fusz, |
| Corporation, Intervenor-Appellant). | ) Judge, Presiding. |

JUSTICE JORGENSEN delivered the opinion of the court:

I.  INTRODUCTION

Plaintiff, First Bank, obtained a judgment against defendants, Unique Marble and Granite Corporation and its corporate officer, Daniel M. Hahn, and moved to collect on that judgment. James Gallo intervened, seeking fees and expenses for his duties as assignee for the benefit of Unique Marble's creditors.  First Bank moved for summary judgment against Gallo, asserting that, as a perfected secured creditor under the Uniform Commercial Code (U.C.C.) (810 ILCS 5/1--101 et seq. (West 2008)), it had priority over Gallo, who was a lien creditor.  810 ILCS 5/9--102(a)(52), 9--317, 9--322(a) (West 2008).  The trial court granted First Bank summary judgment.  Gallo appeals.  We reverse and remand.

## II.  BACKGROUND

Unique Marble was a fabricator of granite and marble countertops.  On November 18, 2008, Unique Marble and Gallo entered into a trust agreement and assignment for the benefit of creditors. The trust agreement stated that the assignee (Gallo) "shall receive reasonable compensation" at a $250 hourly rate for his services and reimbursement of his expenses "from the Assets."

That same day, Gallo wrote to Unique Marble's creditors a letter stating that Unique Marble executed the assignment due to the "financial difficulties from the housing slowdown."  He stated that an assignment is similar to a liquidation under Illinois law and very similar to a chapter 7 bankruptcy in federal court.  He informed the company's creditors that he, as assignee/trustee of Unique Marble's assets, would liquidate the assets by winding down the company's operations and, at the conclusion of the liquidation, would distribute the net proceeds to the company's creditors based on their priority status.  He did not expect that the company's operations would continue past January 2009.  Gallo also informed the creditors that First Bank had a "blanket lien" on the company's assets and that it was not anticipated that the liquidation would yield a distribution to general unsecured creditors.  The estimated total value of the company's liquidated assets was $450,000, and its estimated total liabilities were $1,180,000.

On November 21, 2008, Gallo personally delivered a notice of the assignment for the benefit of creditors to Charles Kepner, a First Bank representative.  Thus, First Bank first learned of the assignment on this date.

On December 23, 2008, the trial court entered a $451,568.08 judgment (plus interest, $500 in attorney fees, and costs) against Unique Marble and Hahn and in favor of First Bank.  The order was based on First Bank's complaint and confession of judgment, filed the same day against Unique

Marble and Hahn, wherein First Bank alleged that it owned several notes reflecting $451,568.08 owed by Unique Marble. First Bank attached to its complaint copies of the notes.

One of the notes, which is for a $250,000 loan, specifies that its collateral is a commercial security agreement dated October 22, 2004, between Unique Marble and Northway State Bank. Under the October 22, 2004, agreement, Unique Marble granted to Northway a security interest in certain collateral to secure a $200,000 loan from Northway to Unique Marble. On February 15, 2005, Northway recorded a continuation statement/U.C.C. financing statement amendment (of a March 28, 2000, security agreement and financing statement) between it and Unique Marble. On October 31, 2005, First Bank succeeded to the interests of Northway.

On February 19, 2009, First Bank sought to enforce the judgment by way of citations to discover assets. On February 24, 2009, a citation was served upon Unique Marble's registered agent. Hahn was served on March 3, 2009. Unique Marble appeared in court on March 27, 2009, through Hahn. After First Bank examined Unique Marble, the citations were dismissed with prejudice. On April 8, 2009, the judgment against Unique Marble remained unsatisfied, and First Bank sought to reinstate the citations. It sent notice to Unique Marble's registered agent and to Hahn. After no one appeared on Unique Marble's behalf, the trial court reinstated the citation against Unique Marble.

Via a letter from his attorney, dated May 5, 2009, Gallo informed First Bank's counsel that Gallo would undertake no further steps to liquidate Unique Marble's assets, because he had been informed that, pursuant to the U.C.C., First Bank would assume responsibility for liquidating the remaining assets that constituted the collateral that secured First Bank's loan to Unique Marble.

On May 22, 2009, Gallo, as assignee for the benefit of Unique Marble's creditors, petitioned to intervene (735 ILCS 5/2--408 (West 2008)) in the collection proceedings, seeking $35,000 under

the trust agreement and $40,000 from First Bank.  In his petition, Gallo asserted that a notice of the assignment was sent to the First Bank on or about November 20, 2008, and that a copy of the trust agreement was hand-delivered to Kepner on November 21, 2008.  Gallo further asserted that, on April 10, 2009, he received notice that Hahn had been served with a citation to discover assets in connection with the judgment against him personally.  Gallo noted that, despite First Bank's knowledge that he held title to Unique Marble's assets, the bank did not serve him with a citation to discover Unique Marble's assets.  Further, he asserted that, although First Bank obtained its judgment in December 2008, it was not until April 13, 2009, that Gallo learned that Unique Marble had been named as a defendant in this matter.  Gallo also asserted that, although he had begun preparations for the final liquidation of Unique Marble's assets, First Bank informed him on April 30, 2009, that it was going to exercise its rights under the U.C.C. and conduct its own auction of the company's personal property assets.  Gallo claimed that he paid or directed to be paid to First Bank $40,000 against the company's indebtedness and made five mortgage payments to First Bank totaling $24,625.  He also alleged that he had incurred $35,000 in outstanding fees and $841 in outstanding expenses.  Gallo was concerned that First Bank was attempting to reap the benefits of his liquidation efforts and to prevent the payment of his outstanding fees and expenses out of the proceeds of the sale of the assets for which he was the assignee.  The citation against Unique Marble, he urged, adversely affected him because, being unable to perform the final liquidation, he had to intervene to seek payment of his outstanding fees and expenses. He sought to intervene and for leave to file an answer to the citation, and he requested payment of his fees and expenses from the auction sale proceeds.

On May 22, 2009, the trial court allowed First Bank to conduct a sale of its collateral, but ordered it to place $35,000 in escrow pending the outcome of the hearing on Gallo's petition to

intervene. The court also ordered Gallo to provide First Bank an accounting pertaining to the assignment, pursuant to a list to be sent by First Bank. On June 8, 2009, First Bank filed a response to Gallo's petition, arguing that: (1) Gallo was attempting to infuse peripheral property into this case; and (2) Gallo's allegations amounted to a claim of unjust enrichment, which should be brought in a separate proceeding. In reply, Gallo asserted that First Bank had knowledge of the assignment, acted in recognition thereof, communicated with him (as evidenced by various e-mails he attached to numerous filings), accepted the benefits of his efforts (i.e., received over $45,000), and did not indicate to Gallo prior to April 30, 2009, that it desired him to cease his liquidation efforts. On June 19, 2009, the court granted Gallo's petition to intervene.

On July 6, 2009, Gallo filed a response to the citation to discover assets and a request for setoff of fees and expenses. He argued that First Bank had notice of the assignment; that during the assignment he had made payments to the bank of over $65,000 on Unique Marble's loan and mortgage; that the bank failed to serve him with the citation; and that he had incurred fees and expenses, which the bank informed him it would not pay. In its reply, First Bank denied that Gallo held the company's assets in trust; admitted that it received over $65,000 from Gallo; asserted that it had perfected its security interest in (and attached a lien upon) Unique Marble's property on March 28, 2000 (the date it recorded a financing statement, a continuation of which was recorded on February 15, 2005); and argued that Gallo had executed his assignment with notice of First Bank's perfected security interest.

On September 18, 2009, First Bank moved for summary judgment on its citation to discover assets, arguing that it was a secured creditor with a perfected security interest (obtained on October 22, 2004) in Unique Marble's collateral and, thus, had priority over Gallo, who was a subsequent lien

creditor (and who had notice of the bank's perfected security interest).[1] In response, Gallo asserted that he entered into the assignment with knowledge of First Bank's perfected security interest, but that, through e-mail correspondence, he provided information to the bank of his liquidation efforts. Gallo asserted that First Bank acquiesced to and benefitted from his efforts and that, thus, he was entitled to his fees and expenses.

On November 2, 2009, the trial court granted First Bank's motion for summary judgment, noting, in a written order, that it was doing so "pursuant to" sections 9--102(a)(52)(B) (definition of "lien creditor" includes an assignee for the benefit of creditors), 9--301(1) (local law of debtor's jurisdiction governs perfection), and 9--322(a)(1) through 9--322(a)(3) (priority rules for competing security interests) of the U.C.C. 810 ILCS 5/9--102(a)(52)(B), 9--301(1), 9--322(a) (West 2008). Gallo appeals.

### III. STANDARD OF REVIEW

Summary judgment is proper where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2--1005(c) (West 2008). Summary judgment is to be granted only where the evidence, when construed most strongly against the moving party, establishes clearly and without doubt the movant's right to relief. Signal Capital Corp. v. Lake Shore National Bank, 273 Ill. App. 3d 761, 767-68 (1995). We review de novo the propriety of an order granting summary judgment. Pagano v. Occidental Chemical Corp., 257 Ill. App. 3d 905, 909 (1994). Further, the construction of a statute is subject to de novo review. In re Application of the County Collector, 391 Ill. App. 3d 656, 659 (2009).

---

[1] It also asserted that, on June 3, 2009, it had sold Unique Marble's collateral at auction.

IV.  ANALYSIS

Gallo argues that the trial court erred in granting First Bank summary judgment.  He contends that an assignee such as himself is not a junior lienholder and that the U.C.C. does not govern the distribution of fees and expenses for an assignee in an assignment for the benefit of creditors. According to Gallo, the common law, not the U.C.C., is the appropriate source to ascertain the priority of paying out of the liquidation proceeds an assignee's fees and expenses incurred in executing his or her duties.  For the following reasons, we conclude that the trial court erred in its reading of the U.C.C. and that the U.C.C. does not preclude the payment of reasonable compensation to Gallo for his services as assignee.

We begin our analysis by reviewing the common law pertaining to assignments for the benefit of creditors.  "An assignment for the benefit of creditors is a voluntary transfer by a debtor of [its] property to an assignee in trust for the purpose of applying the property or proceeds thereof to the payment of [its] debts and returning the surplus, if any, to the debtor."  Illinois Bell Telephone Co. v. Wolf Furniture House, Inc., 157 Ill. App. 3d 190, 194-95 (1987).  A debtor may choose to make an assignment for the benefit of creditors, which is an out-of-court remedy, rather than to petition for bankruptcy, because assignments are less costly and completed more quickly.[2]  See M. Cohen & J. Challacombe, Assignment for the Benefit of Creditors--A Contemporary Alternative for Corporations, 2 DePaul Bus. L.J. 269, 277 (1990).  The assignment is "a unique trust arrangement in which the assignee (or trustee) holds property for the benefit of a special group of beneficiaries, the creditors."  Illinois Bell, 157 Ill. App. 3d at 195.  Thus, the assignee owes a fiduciary duty to the

---

[2]In Illinois, between 1877 and 1939, a statute governed voluntary assignments, but they also existed at common law.  2 DePaul Bus. L.J. 269.

creditors. Paul H. Schwendener, Inc. v. Jupiter Electric Co., 358 Ill. App. 3d 65, 74-75 (2005). Absent some defect in the creation of the assignment itself, an assignment passes legal and equitable title to the debtor's property from the debtor to the assignee. Consolidated Pipe & Supply Co. v. Rovanco Corp., 897 F. Supp. 364, 370 (N.D. Ill. 1995). In such case, the assignment is valid without the consent of any of the debtor-assignor's creditors. Consolidated Pipe, 897 F. Supp. at 370.

Generally, an assignee (and his or her attorney) is entitled to compensation for his or her services. See, e.g., Randolph & Randolph v. Scruggs, 190 U.S. 533, 538-39, 47 L. Ed. 1165, 1170-71, 23 S. Ct. 710, 712-13 (1903) (counsel for an assignee for the benefit of creditors is entitled to a preferred status in claiming compensation out of the estate for services performed prior to the appointment of a bankruptcy trustee); In re Peerless Manufacturing Co., 523 F.2d 110, 112 (7th Cir. 1975) ("An assignee and his attorney perform somewhat the same function as a [bankruptcy] trustee and his attorney and should be compensated even if bankruptcy subsequently occurs"); In re Marks, 267 F.2d 108, 110 (7th Cir. 1959) (a bankruptcy court has authority under the Bankruptcy Act to allow fees to an assignee for the benefit of creditors when the assignment was followed by an involuntary petition in bankruptcy and a trustee was appointed in the bankruptcy proceeding).

Turning to the relevant U.C.C. provisions, section 9--102(a) of the U.C.C. contains the definitions used in Article 9 of the statute. It defines a "lien creditor" as follows:

"(52) 'Lien creditor' means:

(A) a creditor that has acquired a lien on the property involved by attachment, levy, or the like;

(B) an assignee for the benefit of creditors from the time of assignment;

(C) a trustee in bankruptcy from the date of the filing of the petition; or

(D) a receiver in equity from the time of appointment."  (Emphasis added.)
810 ILCS 5/9--102(a)(52) (West 2008).

Generally, a financing statement must be filed to perfect a security interest.  810 ILCS 5/9--310 (West 2008).  Here, it is undisputed that, on October 22, 2004, First Bank perfected its security interest in Unique Marble's collateral.  The parties entered into a security agreement and promissory note.  Under the agreement, Unique Marble provided a description of the collateral and transferred a security interest in it to First Bank; the bank provided Unique Marble with value; and the bank perfected the security interest by filing a financing statement and a continuation statement with the Secretary of State.  810 ILCS 5/9--501(a) (West 2008).

An assignment for the benefit of creditors is perfected as a security interest upon attachment. 810 ILCS 5/9--309(12) (West 2008).  "No filing or other action is required to perfect an assignment for the benefit of creditors.  These assignments are not financing transactions, and the debtor ordinarily will not be engaging in further credit transactions."  810 ILCS Ann. 5/9--309, Uniform Commercial Code Comment, at 500 (Smith-Hurd 2004).  Thus, the assignment to Gallo was perfected on November 18, 2008, about four years after First Bank perfected its security interest in Unique Marble's collateral.

Section 9--322(a) of the U.C.C. sets forth the general priority rules for conflicting security interests and provides that: (1) the first secured party who files (i.e., files an effective financing statement) or perfects (i.e., acquires a perfected security interest--one that has attached and to which any required perfection step has been taken) has priority; (2) a perfected security interest has priority over an unperfected one; and (3) if both security interests are unperfected, the first to attach has priority. 810 ILCS 5/9--322(a) (West 2008); 810 ILCS Ann. 5/9--322(a), Uniform Commercial Code

Comments, at 577-78 (Smith-Hurd 2004). Section 9--317(a) provides that a security interest is subordinate to the rights of: (1) a person entitled to priority under section 9--322 (810 ILCS 5/9--322 (West 2008)); and (2) a person who becomes a lien creditor before the security interest is perfected. 810 ILCS 5/9--317(a) (West 2008).

Here, if Gallo has a security interest as a creditor in Unique Marble's collateral, First Bank's security interest has priority over Gallo's because the bank perfected its interest about four years before the assignment (and perfection) to Gallo. Indeed, Gallo concedes that First Bank perfected its security interest before the assignment. However, he maintains that the inclusion of an assignee for the benefit of creditors in the U.C.C.'s definition of "lien creditor" does not give an assignee an actual security interest in the assets he holds in trust such that he must compete with senior secured parties to receive reasonable fees and expenses incurred in performing his fiduciary duties. Gallo urges that the purpose of including an assignee in the definition of "lien creditor" "was meant only to statutorily assist the assignee, trustee or receiver by giving him or her the benefits of the status of a lien creditor at a fixed point in time." (Emphasis in original.) He argues that an assignee is not granted a security interest in the debtor's assets on the assignment date (i.e., he or she is not a creditor); rather, the assignee is deemed only to have the same rights as a lien creditor as of that date, "for the purpose of comparing the priority or perfection of all other interests in the assets that the assignee is charged with the duty of liquidating." (Emphasis in original.) He notes that the definition does not refer, as it does with respect to a creditor, to an assignee as having acquired a lien on property. 810 ILCS 5/9--102(a)(52) (West 2008). In Gallo's view, an assignee should not be deemed a creditor, because the assignee's role is to aid creditors by liquidating the debtor's assets. Gallo

asserts that the U.C.C.'s drafters intended that later statutory references to the rights of lien holders are meant to include assignees.

First Bank takes issue with Gallo's assertion that he has a common-law right to his fees and expenses that usurps the bank's perfected, secured creditor's rights under the U.C.C. to Unique Marble's collateral. It asserts that the U.C.C. directly conflicts with such a position. First Bank argues that the plain and ordinary meaning of the definition of lien creditor establishes that Gallo, as an assignee, is a creditor who, like other creditors, assumed the risks and benefits of his agreement with Unique Marble and that, as such, he is subject to the U.C.C. provisions concerning priority rights. In First Bank's view, it is telling that the General Assembly did not choose, for example, the term "hypothetical creditor,"[3] as one who has the rights and powers of a creditor but is not a creditor. See, e.g., In re Chaseley's Foods, Inc., 726 F.2d 303, 307 (7th Cir. 1983) (under the Bankruptcy Code, the bankruptcy trustee has the status of a hypothetical lien creditor and the statute permits the trustee to avoid any unperfected liens on property belonging to the bankruptcy estate). First Bank reasons that, because the legislature chose to identify an assignee for the benefit of creditors as a "lien creditor" (and not a hypothetical creditor), the General Assembly therefore chose to classify an assignee as a bona fide creditor subject to the priority rights outlined in the U.C.C. Further, First Bank notes that the Bankruptcy Code provides that a court "may allow reasonable compensation *** for the trustee's services" (11 U.S.C. §326(a) (2006)) and that a similar provision is not contained in

[3]This term does not appear in the Bankruptcy Code (11 U.S.C. §101 et seq. (2006)). However, a bankruptcy trustee exercising rights and powers under section 544 of the Bankruptcy Code (11 U.S.C. §544 (2006)) is commonly referred to as a "hypothetical creditor." In re Colon, 563 F.3d 1171, 1174 (10th Cir. 2009).

the U.C.C. First Bank concedes that neither the current nor the former version of section 9--102(a)(52)(A) (see Ill. Rev. Stat. 1991, ch. 26, par. 9--301 (amended by Pub. Act 91--893, §5, eff. July 1, 2001)) grants an assignee a security interest. However, it asserts that the U.C.C. provides an assignee with a competing creditor interest in the debtor's assets and can provide an assignee with a competing security interest when the assignee complies with the appropriate statutory provisions. See 810 ILCS 5/9--317(a)(1) (West 2008) (a lien creditor will take under section 9--322 if it satisfies the elements of that provision).

We disagree with First Bank that the inclusion of an assignee for the benefit of creditors within the definition of "lien creditor" in section 9--102(a)(52) of the U.C.C. acts, in the context of assessing an assignee's right to his or her fees and expenses, to transform an assignee into a creditor with a competing security interest for the debtor's collateral. In construing a statute, our principal objective is to ascertain and give effect to the intent of the legislature. Alvarez v. Pappas, 229 Ill. 2d 217, 228 (2008). Where the language is clear and unambiguous, the statute must be given its plain, ordinary, and popularly understood meaning without resort to further aids of statutory construction. Alvarez, 229 Ill. 2d at 228. First Bank's reading is not clear to us from the plain and ordinary meaning of the terms used in the definition, and it is illogical given the role of an assignee. As Gallo notes, the section 9--102(a)(52) definition of "lien creditor" includes, in one subpart, a creditor who "has acquired a lien" (emphasis added) (810 ILCS 5/9--102(a)(52)(A) (West 2008)), but it does not, in the other three subparts, refer to assignees, trustees in bankruptcy, or receivers in equity as persons who have acquired liens (810 ILCS 5/9--102(a)(52)(B) through (a)(52)(D) (West 2008)).

We agree with Gallo that an assignee cannot be required to forgo the payment of the reasonable fees and costs of administering the assignment until perfected security interests have been

fully satisfied. In construing a statute, we presume that the General Assembly did not intend an absurd, inconvenient, or unjust result. Hall v. Henn, 208 Ill. 2d 325, 330 (2003). It is a rare entity, in our view, that would have no secured creditors. Thus, if assignees were required to forgo payment in favor of perfected security interests, no assignee would take on the task of liquidating assets, and assignments for the benefit of creditors would cease to be available as an efficient method of maximizing the liquidation value of troubled companies. We do not read this legislative intent from the plain meaning of section 9--102(a)(52)'s language, which contemplates the continued existence of assignments for the benefit of creditors. Further, as Gallo suggests, First Bank's interpretation would put an assignee in competition with the creditors he or she is bound to serve. That is an absurd scenario because it transforms a fiduciary into a competing creditor. Moreover, an assignment for the benefit of creditors is a common-law vehicle used to liquidate a company's assets, and, pursuant to the common law, the assignee has a right to his or her reasonable fees and expenses. If the General Assembly, in enacting the U.C.C., had intended to foreclose this common-law right, it would have, in our view, clearly and explicitly set forth in the statute that a perfected secured creditor such as First Bank has priority over the assignee's right to fees and expenses. It did not do so.

Marquette National Bank v. B.J. Dodge Fiat, Inc., 131 Ill. App. 3d 356 (1985), upon which First Bank relies to argue that lien creditors are bona fide creditors with competing claims to the debtor's assets under the U.C.C., does not warrant a different result. There was no assignment for the benefit of creditors in that case. Rather, Marquette involved two creditors competing for the same assets in a bank account. Marquette, 131 Ill. App. 3d at 361-64 (holding that a secured creditor could not claim a security interest in general account funds because it had not sufficiently attempted to trace to the account the proceeds of the sale of an automobile).

Here, it is undisputed that First Bank obtained a perfected security interest in Unique Marble's collateral on October 22, 2004; that Gallo entered into an assignment in November 2008 via a trust agreement that provided that he would receive reasonable compensation for his services and reimbursement of his expenses; and that Gallo became a lien creditor on that date. Because we conclude that the U.C.C. does not transform an assignee into a creditor with a competing security interest for the debtor's collateral, Gallo is thereby entitled to receive reasonable compensation for his services and reimbursement of his expenses as assignee before the satisfaction of perfected secured creditors' claims. In sum, we conclude that the trial court erred in granting First Bank summary judgment.

Having concluded that Gallo is entitled to reasonable compensation, we feel compelled to comment on the scope of the trial court's calculation of reasonable compensation. On remand, the trial court is to take into account that Gallo's compensation shall be based at least in part on the benefits that First Bank received between the date it had notice of Gallo's assignment and the date First Bank notified Gallo to cease his liquidation efforts. This is so because, through Gallo's efforts, First Bank received certain payments and, by not objecting to the assignment upon notice thereof, First Bank, at a minimum, implicitly accepted the services that Gallo rendered. In other words, in spite of First Bank's status as a secured creditor, Gallo's notice to the bank and the bank's implicit acceptance of his services enable Gallo to collect reasonable compensation for his services. The calculation may be based on the concept of quantum meruit, which literally means "as much as he deserves." Much Shelist Freed Denenberg & Ament, P.C. v. Lison, 297 Ill. App. 3d 375, 379 (1998) ("Quantum meruit is based on the implied promise of a recipient of services to pay for valuable services because otherwise the recipient would be unjustly enriched").

V.  CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Lake County is reversed and the cause is remanded for a determination of the amount of reasonable compensation to be paid Gallo for his services as assignee.

Reversed and remanded.

McLAREN and HUTCHINSON, JJ., concur.